# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

TYRONE D. ARDS,

                        Plaintiff,

v.                                                      Case No. 15-CV-1293-JPS

CHRISTOPHER DE LA VEGA,
TRAVIS BRADY, and
LORA BLASIUS,                                           ORDER

                        Defendants.

1.      INTRODUCTION

        Plaintiff Tyrone Ards ("Ards"), a prisoner, brings this action against several prison officials pursuant to 42 U.S.C. § 1983. The Court permitted two claims to proceed past the screening stage. (Docket #9); *see* 28 U.S.C. § 1915A. First, Ards alleges that Defendant Christopher De La Vega ("De La Vega") violated the Eighth Amendment prohibition on the use of excessive force after he slammed Ards' finger in the trap door of his cell. Second, Ards claims that Defendants Travis Brady ("Brady") and Lora Blasius ("Blasius") showed deliberate indifference to his serious medical needs, in violation of the Eighth Amendment, when they decided to leave sutures in his injured finger for too long and refused his requests for narcotic pain medication.

        On August 1, 2016, Defendants filed a motion for summary judgment as to both of Ards' claims. (Docket #33). On August 23, 2016, Plaintiff timely filed a response to the motion. (Docket #44).[1] On September 7, 2016,

---

[1] On September 2, 2016, Plaintiff filed a motion for extension of time to file his response. (Docket #56). Plaintiff explained that he was unsure whether he had mailed his response to the correct court and sought additional time to resubmit the brief in case he had sent it elsewhere. *Id.* Because the Court did receive his response, Plaintiff's motion will be denied as moot.

Defendants replied. (Docket #58). The motion is fully briefed and, for the reasons explained below, it will be granted in part and denied in part.

2.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

3.     RELEVANT FACTS

Ards is currently incarcerated at Columbia Correctional Institution ("Columbia"). (Defendants' Reply to Plaintiff's Response to Defendants'

Proposed Findings of Fact ("DFOF"), Docket #60, ¶ 1).[2] At all times relevant to this litigation, he was incarcerated at Racine Correctional Institution ("Racine"). *Id.* Defendant Christopher De La Vega has been employed as a correctional officer at Racine since January 13, 2014. *Id.* ¶ 2.[3] Defendant Lora Blasius is a nurse practitioner in the Health Services Unit at Racine and has been since 2011. *Id.* ¶ 3; (Defendants' Response to Plaintiff's Proposed Findings of Fact ("PFOF"), Docket #59, ¶ 3).[4] Defendant Travis Brady has been employed as a nurse at Racine since November 2007. DFOF ¶ 4.

### 3.1    Excessive Force Claim

On December 7, 2014, De La Vega was assigned to the lower Waukesha West segregation unit where Ards was housed. *Id.* ¶ 8. Prior to December 7, 2014, De La Vega had never had a negative interaction with Ards. *Id.* ¶ 10. At approximately 5:20 p.m., after picking up dinner trays, De La Vega was returning to the segregation control unit, commonly referred to as the "bubble." *Id.* ¶ 11. Ards asked De La Vega, while on his way to the bubble, if he would bring him his antacid medication. *Id.* ¶ 12. De La Vega told Ards that he would check with his superior on duty, Sergeant Springtube, to confirm that Ards should receive antacid medication. *Id.*

---

[2]Defendants filed a reply in support of their statement of material facts. (Docket #60). The Local Rules do not contemplate a reply in support of the moving party's own statement of facts, *see* Civil L. R. 56(b)(3)(B), but Plaintiff did not object to its filing and the document succinctly presents the parties' competing views of the record evidence. As a result, the Court will reference it here.

[3]Plaintiff refers to this defendant as "Christopher Delavega," but Defendant refers to himself in his affidavit as "Christopher De La Vega." The Court will use Defendant's spelling as evidenced in his affidavit.

[4]Plaintiff refers to this defendant as "Lara Blesius," but Defendant refers to herself in her affidavit as "Lora Blasius." The Court will use Defendant's spelling as evidenced in her affidavit.

After confirming that Ards was to receive antacid medication, De La Vega brought the medication bottle to Ards' cell. *Id.* ¶ 13. De La Vega opened the upper trap of Ards' cell door and attempted to dispense the medication into Ards' hand from the bottle. *Id.* ¶ 20. Ards directed De La Vega to give him four tablets, and De La Vega agreed to do so because the request did not significantly exceed the daily recommended dose. *Id.* ¶ 21.[5]

At this point, the parties' versions of events diverge. Defendants themselves acknowledge this, stating that "[t]here is a dispute of fact as to the sequence of events that occurred leading up to Ards' finger being closed into the trap door." PFOF ¶ 14. According to De La Vega, as he was attempting to pour the tablets into Ards' outstretched hand, Ards grabbed De La Vega's right hand, which was holding the bottle, and attempted to pull De La Vega's hand and the bottle into his cell, saying in a loud and aggressive tone, "Fuck that! Give me that shit right now!" DFOF ¶ 22. Ards and De La Vega struggled for a few seconds before De La Vega was able to free his hand from Ards' grip. *Id.* ¶ 23. Ards then returned his hands inside his cell, saying, "Yea mother fucker." *Id.*

When Ards moved his hands back inside his cell, De La Vega "bladed" his body by positioning himself at a diagonal to the cell door rather than standing directly in front of it. *Id.* ¶ 24. De La Vega claims that he wanted to keep a safe distance from Ards to avoid further physical contact. *Id.* ¶ 25. Next, De La Vega, standing to the side of Ards' cell door, positioned his right foot under the flap of the hinged cell trap door. *Id.* ¶ 26. Once the

---

[5]The parties dispute whether De La Vega was authorized to dispense a higher dosage of antacid medication than what was recommended. *See* DFOF ¶ 21; PFOF ¶¶ 15–16. Because Plaintiff makes no claim related to an overdose of the medication, this dispute is immaterial.

Case 2:15-cv-01293-JPS   Filed 11/16/16   Page 4 of 27   Document 64

trap was in the ready position to be closed, De La Vega lifted his foot to provide sufficient momentum that the trap would latch securely when it made contact with the locking mechanism. *Id.* ¶ 27.

According to De La Vega, as the trap door was already in motion to close, Ards stuck his fingers out of the trap near the lock mechanism and his hand was caught in the closing door. *Id.* ¶ 28. De La Vega asked Ards if he was ok, but Ards did not respond. *Id.* ¶ 29. De La Vega immediately notified Sergeant Springtube of what had happened, who then notified his superior, Captain Serrano. *Id.* The Health Services Unit was also notified. *Id.* ¶ 30. Ards was first seen by Defendant Brady and then sent to the Wheaton Franciscan Hospital ("Wheaton") emergency room for treatment. *Id.*

Ards' account differs significantly from De La Vega's. Ards claims that De La Vega tried to dump the antacid pills into Ards' hand and then, seemingly inexplicably, De La Vega "dumped [sic] back and kicked the trap door while [Ards] was trying to get his medication." *Id.*; (Declaration of Tyrone Ards, Docket #51, ¶ 12).[6] According to Ards, he never touched De La Vega's hand or the medication bottle, nor did he "become loud" or exclaim as De La Vega contends. DFOF ¶¶ 22–23; (Plaintiff's Declaration in

---

[6]Ards contends that he had special restrictions applicable to him because he was on clinical observation. PFOF ¶ 13. Those restrictions are, in his words, "[b]ack to cell, lower trap, [h]ook meds, etc." *Id.* The Court received no clearer explanation of what these restrictions entail, but it appears that Plaintiff believes that he should have been ordered to stand with his back to the back wall of his cell so as to preclude him from interfering with De La Vega's medication dispensing. *See id.* Defendant objects to this assertion, noting that Plaintiff did not cite any evidence that he was under such restrictions. *Id.* Further, Defendants claim that even if De La Vega failed to follow the security restrictions applicable to Ards, that conduct does not amount to a constitutional violation. *Id.*; *see also* DFOF ¶ 19. Given the other factual disputes raised by the parties' presentations, discussed further below, De La Vega's alleged failure to follow these security precautions is of little moment to the instant decision.

Opposition to Christopher De La Vega's Declaration ("Pl. Decl. Opp. De La Vega"), Docket #47, ¶¶ 15–17). Additionally, Ards indicates that he did not pull his hand back inside the trap door until after Sergeant Springtube arrived. DFOF ¶ 24; Pl. Decl. Opp. De La Vega ¶¶ 17–18. Further, Ards contends that there was a large window in the side of his cell and, through the window, he observed that De La Vega never bladed himself in relation to the cell door. Pl. Decl. Opp. De La Vega ¶¶ 18–20. Ards appears to contend that his hand was outstretched through the door to receive the medication during the entire encounter with De La Vega, and that De La Vega knew this because he never bladed himself in relation to the door, thereby discrediting De La Vega's assertion that he did not know that his kick to the trap door would catch Ards' hand. *See* DFOF ¶¶ 27–28; Pl. Decl. Opp. De La Vega ¶¶ 15–22. In short, then, Ards believes that De La Vega purposefully kicked shut the trap door with Ards' hand in the way. (Declaration of Tyrone Ards, Docket #51, ¶ 12).[7]

Ards further asserts that rather than inquire whether Ards was injured, De La Vega simply walked away from Ards' cell after the trap door shut on his hand. DFOF ¶ 29; (Declaration of Tyrone Ards, Docket #51, ¶ 13). Ards claims that when Sergeant Springtube came out of the bubble, he spoke with Ards and "was able to gain complies [sic] by having Ards place his hand in the trap without further problems." PFOF ¶ 18. Sergeant Springtube then

---

[7]Ards claims that video footage of the December 7, 2014 incident existed and that Racine employees destroyed it to cover up De La Vega's alleged misconduct. (Declaration of Tyrone Ards, Docket #51, ¶¶ 18–21). The Court will not consider the import of the absence of these purported videotapes here since Ards has offered no more than speculation as to possible spoliation and has not requested any particular relief. *See* Fed. R. Civ. P. 37 (outlining procedures for seeking relief from the opposing party's discovery violations).

notified Captain Serrano, who called Defendant Brady. *Id.* ¶¶ 19–20. Brady arrived, evaluated Ards' injury, and then sent him to Wheaton for further treatment. *Id.* ¶¶ 21–22.

De La Vega prepared an incident report relating to the events of December 7, 2014, which was ultimately reviewed by the prison security director, Jason Aldana ("Aldana"). DFOF ¶ 31. Aldana concluded that De La Vega did not intentionally injure Ards and that he properly responded when he saw Ards was injured. *Id.* ¶ 32. An Inmate Complaint Examiner reviewed De La Vega's report and Aldana's findings. *Id.* ¶ 33. She also determined that there was no unlawful use of force against Ards. *Id.*

### 3.2    Deliberate Indifference Claim

As noted above, Brady saw Ards in the Health Services Unit on December 7, 2014, after Ards' finger was injured. *Id.* ¶ 35. Brady consulted with the on-call physician, who determined that Ards should be taken to the emergency room for treatment. *Id.* Ards was taken to Wheaton on that same day and diagnosed with a laceration to his right hand and an open fracture and nail injury to his right index finger. *Id.* Ards received sutures at the emergency room for these injuries. *Id.* ¶ 37.

#### 3.2.1    Suture Removal

In Ards' discharge instructions, the emergency room physician noted that the sutures should be removed in seven days. *Id.* ¶ 38. Ards was also prescribed Vicodin for pain and an antibiotic. *Id.* Ards received his antibiotic from December 9, 2014, through December 21, 2014. *Id.* ¶ 39. Ards received follow-up care both on-site at Racine by Health Services Unit staff and off-site by outside medical providers. *Id.* ¶ 40.

On December 9, 2014, Dr. Michael Birndorf, an orthopedic hand surgeon associated with Wheaton Franciscan Medical Group, saw Ards for

Case 2:15-cv-01293-JPS    Filed 11/16/16    Page 7 of 27    Document 64

a scheduled follow-up appointment. *Id.* ¶ 41. Dr. Birndorf scheduled another follow-up appointment for approximately two weeks later and planned to remove Ards' sutures at that time. *Id.* ¶ 42. The follow-up appointment never occurred. PFOF ¶ 32.

On December 15, 2014, Ards submitted a Health Service Request indicating that "the top of my finger by the nail part is turning a whitish green." DFOF ¶ 43. The next day, on December 16, 2014, Ards was seen by a Health Services Unit nurse, Mark Weber ("Weber"). *Id.* ¶ 44. Weber noted a low-grade fever and high heart rate. *Id.* ¶ 45. Based on that information, coupled with Ards' report of finger discoloration, Weber sent Ards to the Wheaton emergency room. *Id.* That same day, after arriving at the hospital, Ards was seen by seen by Jill Wanggaard, an advanced practice nurse prescriber. *Id.* ¶ 46. She observed the following: "Finger injury appears to be healing. No drainage noted at this visit. Patient was uncooperative and would not let me touch the finger. I do not appreciate any unusual color change other than bruising to the finger. Patient is…moving the finger well." *Id.* Additionally, x-rays were taken that showed no signs of infection. *Id.* Similarly, on December 17, 2014, Ards saw Brady in the prison for a follow-up appointment. *Id.* ¶ 47. Brady wrote in his notes that Ards' fingertip was a normal color and that he had no discharge from the wound. *Id.* The injury was wrapped in gauze and the splint was replaced. *Id.*

Two days later, on December 19, 2014, Blasius instructed nurse Kim Ewatter that, consistent with Dr. Birndorf's December 9, 2014 order, Ards' sutures could be removed 10–14 days after the injury. *Id.* As part of the nursing staff, Blasius and Brady must defer to the treatment decisions of Ards' treating physicians, including Dr. Birndorf. *Id.* ¶ 49. The timing of suture removal varies with the anatomic site. *Id.* ¶ 50. Sutures in the hands

and feet are typically removed in 10–14 days. *Id.* According to Ards' medical records, Brady removed Ards' sutures on December 22, 2014, fifteen days after the initial injury, without problems. *Id.* ¶ 51. At the time the sutures were removed, Brady noted "no sign or symptom [of] infection," although Ards indicated that his finger was still in pain. *Id.* ¶ 52.

Ards attempts to dispute Blasius' decision to follow Dr. Birndorf's order rather than the discharge order of the Wheaton emergency room physician. *Id.* ¶ 50. Ards claims that Blasius should have deferred to the orders of the doctor who applied the sutures—the emergency room doctor—and not Dr. Birndorf. *Id.* Ards produced no medical expert testimony or reports, or any other evidence, to support this contention. Instead, he relies solely on his own view of what Blasius should have done.

### 3.2.2 Pain Medication

While Ards was in the emergency room on December 7, 2014, he received Vicodin for pain. *Id.* ¶ 54. On December 8, 2014, a verbal order was entered by an unknown medical provider at the prison for Tylenol 3/acetaminophen, with a dosage of 1–2 tablets to be taken up to three times per day for seven days or as needed. *Id.* ¶ 55. Blasius avers that Tylenol 3 is an opioid pain medication used to treat acute, short-term moderate to severe pain. *Id.* ¶ 56. She further avers that narcotics are habit-forming and studies have shown that long-term use can be counterproductive in controlling pain. *Id.* In her opinion, over-the-counter pain medications are usually more

appropriate for treating long-term pain because they go to the site of the pain and block the pain receptors. *Id.*[8]

On December 15, 2014, Dr. Richard Steliga, another prison physician, ordered Tylenol 3/acetaminophen with codeine for Ards' pain. *Id.* ¶ 57. The dosage was identical to the December 8, 2014 prescription. *Id.* Ards received doses of this medication on December 9–17 and December 19–21, 2014. *Id.* ¶ 58. On December 24, 2014, nurse Daniel Townley ("Townley") saw Ards in the Health Services Unit at the segregation sergeant's request. *Id.* ¶ 59. At that time, Ards complained of stabbing and aching pain and numbness in his finger. *Id.* Townley noted that Ards' range of motion was intact, there was no redness or swelling in his finger, and that Ards' continued complaints of pain may have been related to attention-seeking behavior—something Ards denies. *Id.*; (Plaintiff's Declaration in Opposition to Travis Brady's Declaration ("Pl. Decl. Opp. Brady"), Docket #48, ¶ 23). Defendants claim that Townley offered acetaminophen to alleviate Ards' pain, though the medical records supplied do not reflect such an offer. DFOF ¶ 60.[9]

---

[8] Ards tried to dispute Blasius' assertions about the long-term effects of narcotic pain medication. *See* DFOF ¶ 56. His only retort, however, is that these are conclusions for medical experts and the jury to make. *Id.* He cites no medical expert report and or any other evidence contrary to her assertions and has, therefore, failed to properly dispute them for purposes of summary judgment. *See* Fed. R. Civ. P. 56(c) (requiring the non-movant to cite to particular parts of the record demonstrating a genuine dispute of fact or to explain why the cited material does not support the asserted fact).

[9] Ards claims that Townley offered him nothing because, as Brady avers, nurses are not allowed to prescribe over-the-counter medications. DFOF ¶ 60; Pl. Decl. Opp. Brady ¶ 22. Defendants claim that Townley could offer but not prescribe acetaminophen. DFOF ¶ 60. This dispute is not material to the resolution of this motion, since Ards has not named Townley as a defendant.

On December 26, 2014, Ards commenced a hunger strike, stating, "I was supposed to see the bitch ass nurse." *Id.* ¶ 61. On December 29, 2014, Ards was seen by Health Services Unit nurse Amandy Moore, who ordered 200 mg strength ibuprofen to address Ards' continuing complaints of pain. *Id.* ¶ 62. On January 3, 2015, Townley saw Ards in the Health Services Unit for his daily hunger strike assessment. *Id.* ¶ 63. Ards indicated to Townley that he wanted treatment and that "treatment is the same as ending the hunger strike." *Id.* Townley determined that Ards' nutrition and hydration were insufficient for his body's needs and sent him to the Wheaton emergency room for further assessment. *Id.*

Later that day, Ards saw physician's assistant Daniel Teska at Wheaton. *Id.* ¶ 64. Ards was diagnosed with dehydration, an old healed fracture of bone,[10] and semi-starvation. *Id.* During this visit, Ards was prescribed fifteen tablets of Tylenol 3. *Id.* ¶ 65. When Ards returned to Racine on January 3, 2015, Blasius, Ards' assigned care provider, did not order the prescription for Tylenol 3. *Id.* ¶ 66. Rather than order the Tylenol 3 prescribed at the hospital, Blasius continued Ards on 200 mg strength ibuprofen to be taken as needed. *Id.* ¶ 68.

As the assigned nurse practitioner, Blasius had the final say on when to stop or start medications and could override hospital recommendations if she felt it was in the patient's best interest. *Id.* ¶ 67. She opines that she decided to override the hospital's orders for two primary reasons. First, Tylenol 3 is potentially addictive and prison staff have an interest in limiting inmate access to narcotics. *Id.* ¶ 66. Second, Ards' injury was almost a month

---

[10]Ards contends, without elaboration or citation to evidence, that his finger was not fully healed at this point. *See* DFOF ¶ 65.

old and he already had been prescribed Tylenol 3 for more than two weeks immediately following his injury. *Id.* ¶ 68. Because narcotics are not generally used for long-term pain management, Blasius felt that over-the-counter medication was more appropriate than Tylenol 3 to treat Ards' chronic pain resulting from his hand injury. *Id.* Blasius asserts that Ards' pain was from an acute fracture and that, over time, the body's natural healing process occurs and the pain dissipates. *Id.* ¶ 69.

As with Blasius' decision to follow Dr. Birndorf's order regarding the sutures, here Ards takes exception to Blasius' decision not to fill the Tylenol 3 prescription from Wheaton. He appears to claim that Blasius acted outside the scope of her experience and medical judgment when she refused to follow the hospital's order. *Id.* ¶ 67; Pl. Decl. Opp. Brady ¶ 29. Similarly, he argues that Blasius' assessment of Ards' healing progress was not within the scope of her authority to make. *See* DFOF ¶ 68. Ards fails, however, to appreciate or distinguish the nuances in Blasius' authority as a nurse practitioner: namely, her authority to ignore physician instructions regarding suture removal in contrast to outside provider instructions regarding medication prescriptions. *Compare* (Declaration of Lora Blasius, Docket #37, ¶ 14), *with* (Plaintiff's Declaration in Opposition to Lora Blasius' Declaration ("Pl. Decl. Opp. Blasius"), Docket #49, ¶ 24).

On January 9, 2015, Ards was transferred from Racine to Columbia. DFOF ¶ 71. After being transferred, Ards was seen by the Health Services Unit at Columbia regarding his complaints of ongoing pain. *Id.* ¶ 72. On January 11, 2015, Ards submitted a Health Services Request form asking when he would be receiving the Tylenol 3 that had been prescribed at Wheaton on January 3, 2015. *Id.* A prison nurse responded and told Ards that the last order for Tylenol 3 was made on December 15, 2014, with no refills.

*Id.* She further informed Ards that if he was still having pain he would need to be evaluated by Columbia healthcare staff. *Id.*

On January 12, 2015, Ards submitted a medication refill request, again asking for the Tylenol 3 that had been prescribed on January 3, 2015, by Wheaton staff. *Id.* ¶ 73. Columbia Health Services Unit staff responded that the prescription could not be refilled and a Health Service Request was required to request an appointment. *Id.* Ards submitted another Health Service Request on January 13, 2015, indicating that he was still in pain and again referencing the Wheaton order for Tylenol 3. *Id.* ¶ 74.

On January 14, 2015, Columbia nurse Shelli Jarocki saw Ards for his pain complaint and offered acetaminophen to alternate with the ibuprofen for pain until he could be seen off-site for further evaluation. *Id.* ¶ 75. On February 21, 2015, Ards submitted yet another Health Service Request asking for "my Tylenol," which presumably meant the January 3, 2015 prescription for Tylenol 3. *Id.* ¶ 76. Columbia nurse Melissa Thorne responded that there was no order for Tylenol 3 and that the prescription issued in January 2015 indicated no refills. *Id.*

Ards claims that Defendants' failure to provide proper pain medication slowed the healing process. PFOF ¶ 57. Ards cites medical reports that he believes show that his finger was not fully healed until approximately sixteen months after the December 7, 2014 incident. *Id.* ¶¶ 58–60. Defendants do not dispute that Ards' finger continued to heal over time but disagree with the assertion that lack of pain medication caused any delay. *See id.* Ards further asserts that he was denied Tylenol 3 not for any medical reason but to save costs for the institution. (Declaration of Tyrone Ards, Docket #52, ¶ 9).

4.     ANALYSIS

Plaintiff's two claims are fundamentally distinct. To go to the jury with his deliberate indifference claim, Plaintiff was required to provide credible evidence raising disputes of fact as to the reasonableness of Defendants' medical judgment. This he has not done, and so the claim must be dismissed. By contrast, the excessive force claim raises triable questions of fact. The claim ultimately rests on a credibility determination regarding Plaintiff's and De La Vega's versions of the events of December 7, 2014. On summary judgment, the Court cannot make such a determination. Likewise, because De La Vega's assertion of qualified immunity rests on disputed facts, which the Court must here resolve in Ards' favor, De La Vega cannot avail himself of qualified immunity at this time. Accordingly, as explained further below, the Court must grant summary judgment as to the deliberate indifference claim and deny summary judgment as to the excessive force claim.

4.1     Deliberate Indifference

For an Eighth Amendment claim of deliberate indifference to a serious medical need, the plaintiff must prove: (1) an objectively serious medical condition; (2) that the defendants knew of the condition and were deliberately indifferent in treating it; and (3) this indifference caused the plaintiff some injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).[11] The deliberate indifference inquiry has two components. "The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Id.* Even if an official is aware of the risk to the inmate's health, "he is free from liability if he 'responded reasonably to the

---

[11]Defendants do not contest, for purposes of their motion, that Ards' finger injury was a serious medical condition. (Docket #34 at 16).

Case 2:15-cv-01293-JPS   Filed 11/16/16   Page 14 of 27   Document 64

risk, even if the harm ultimately was not averted.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)).

Negligence cannot support a claim of deliberate indifference, nor is medical malpractice a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). The question is not whether the plaintiff believes some other course of treatment would have been better. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). Instead, he must prove that the defendant's treatment decisions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996). Put differently, the plaintiff must show that his medical providers made treatment decisions "'so dangerous' that the deliberate nature of [their] conduct can be inferred." *Gayton*, 593 F.3d 623 (quoting *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999)); *see also Walker v. Zunker*, 30 F. App'x 625, 628 (7th Cir. 2002) ("Mere dissatisfaction with a particular course of treatment, or even malpractice, does not amount to deliberate indifference.").

Ards' evidentiary presentation on his deliberate indifference claim falls well short of raising triable questions of fact. At best, Ards offers only his own views as to what treatment he should have received. For instance, it is his opinion that Blasius should have followed the seven-day timeline for suture removal indicated by the Wheaton emergency room physician and not the fourteen-day timeline ordered by Dr. Birndorf. Yet Ards points to no record evidence, whether in the form of prison policy or medical expert opinion, showing that Blasius was not authorized to follow Dr. Birndorf's opinion over that of the emergency room physician. *See Petties v. Carter*, No. 14–2674, 2016 WL 4631679, at *4 (7th Cir. banc Aug. 23, 2016) (observing that

failure to follow protocols may support finding of deliberate indifference) (citing *Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005)). Nor does he offer any evidence, beyond his own assessment of the circumstances, that Blasius' treatment decision was such a reckless departure from accepted medical standards as to show deliberate indifference to his medical needs. *Estate of Cole*, 94 F.3d at 261–62. Indeed, Ards does not provide evidence of what the appropriate medical standards are, much less how Blasius violated them.

This is not a case where a prison physician ignored the opinion of a specialist regarding a serious medical need. *See Gil v. Reed*, 381 F.3d 649, 663–64 (7th Cir. 2004). The opposite is true, for Blasius determined that she should follow the instructions of Dr. Birndorf, an orthopedic hand surgeon, over those of the emergency room physician. There is no indication that her deference to Dr. Birndorf that was "blind or unthinking" or that following Dr. Birndorf's order was likely to harm Ards in some way. *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010). Additionally, the record reveals that Defendants responded quickly to Ards' complaint of infection and even sent him back to the hospital for evaluation of that complaint. That complaint, of course, eventually came to nothing, since the hospital staff found no sign of infection in Ards' finger.

Furthermore, "while it is true that a delay in necessary treatment can establish deliberate indifference, 'verifying medical evidence' must exist to show how the delay adversely affected a patient's condition." *Reynolds*, 84 F. App'x at 674 (quoting *Langston v. Peters*, 100 F.3d 1235, 1240–41 (7th Cir. 1996)); *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) (finding that the plaintiff must show that the delay in treatment exacerbated his existing injury or otherwise harmed him). The record shows that Ards' wound was not infected during the period the sutures were in place or on the day they

were removed. Ards fails to show that he suffered some concrete harm from the delay in suture removal. Rather, the evidence, viewed in Ards' favor, demonstrates that, at worst, his finger healed somewhat slowly. His personal belief that his finger became infected and changed colors does not carry his burden on this claim, and so it must be dismissed. *See, e.g., Davis v. Samalio*, 286 F. App'x 325, 328 (7th Cir. 2008) (affirming grant of summary judgment where prisoner proffered no competent medical evidence supporting his claim that an eight-day delay in treatment had a detrimental effect).

The same goes for his claim regarding Defendants' failure to provide him narcotic pain medication. Plaintiff believes that he should have received Tylenol 3 in late December 2014 , after his prescription from Dr. Steliga ran out. He also contends that he was inappropriately denied the Tylenol 3 prescribed for him at Wheaton in January 2015. In neither instance has Plaintiff produced colorable evidence showing what the standard of care was for prescribing him pain medication, how that standard was violated, or how that violation meets the high bar required to show that Defendants acted with deliberate indifference to his need for medication. Again, he offers no more than his own views on the matter, though he himself admits that he is not a doctor and cannot offer expert opinion on the appropriate standards Defendants should have followed. *See* DFOF ¶ 21.[12]

---

[12]In fact, much of the evidence relating to Ards' requests for pain medication involves healthcare providers at Columbia, not Racine. Whether or not those persons impermissibly refused his repeated demands for Tylenol 3, they are not defendants here and there is no theory under which Blasius and Brady could be responsible for their conduct. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (officials are liable for another's constitutional violation only where they know of it, condone it, approve it, facilitate it, or turn a blind eye toward it).

This case is much like *Fitzgerald v. Greer*, 324 F. App'x 510, 514–15 (7th Cir. 2009), where the Seventh Circuit found that denial of narcotic pain medication did not rise to the level of deliberate indifference. The plaintiff in *Fitzgerald* claimed that he should have been prescribed methadone but was only given ibuprofen. *Id.* The Court of Appeals concluded that the doctors' decision was grounded in medical judgment—namely, that the plaintiff had no objective indications of pain and had a penchant for exaggerating his pain. *Id.* at 515. The court declined to second-guess the doctors' treatment decision, observing that "[w]e must give deference to a doctor's treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)).

Here, as in *Fitzgerald*, the Court cannot disturb Defendants' decision not to give Ards Tylenol 3. As Blasius explained in her affidavit, she relied on several objective factors in concluding that such a prescription was inappropriate, including the general need to limit inmate access to narcotics, the potentially addictive nature of narcotic pain medications, the age of Ards' injury, and the limited usefulness of narcotics as opposed to over-the-counter medications in treating long-term pain. Like the Seventh Circuit, this Court cannot second-guess Blasius' treatment decisions absent evidence that no other minimally competent medical professional would have done the same. Ards argues that Blasius was influenced by the cost of Tylenol 3 versus over-the-counter painkillers, but this alone does not support a deliberate indifference claim absent a showing that she knew the less expensive treatment method would be ineffective. *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Since Ards has provided no evidence coming close to that mark, the Court cannot allow this claim to proceed to the jury.

Ards' bare reliance on his own judgment about his medical care is inadequate to withstand summary judgment on his deliberate indifference claim. *See Snipes*, 95 F.3d at 591; *Reynolds v. Barnes*, 84 F. App'x 672, 674 (7th Cir. 2003) ("[T]he Constitution does not mandate that a prisoner receive exactly the medical treatment he desires."). Accordingly, summary judgment is appropriate on this claim.

### 4.2    Excessive Force

The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" on prisoners. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). When an official is accused of using excessive force, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *Santiago v. Walls*, 599 F.3d 749, 757 (7th Cir. 2010). Several factors are relevant to this determination, including the need for force, the amount applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury caused to the prisoner. *Hudson*, 503 U.S. at 7; *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004). Generally, a *de minimis* use of force cannot support a constitutional claim. *Hudson*, 503 U.S. at 2. However, Defendants concede, for purposes of summary judgment, that Ards' injury was severe and that, as a result, De La Vega's use of force should not be considered *de minimis*. (Docket #34 at 12).

The Seventh Circuit has, on several occasions, addressed claims of excessive force where a correctional officer closes a cell trap door on an inmate, causing him injury. Those precedents demonstrate that summary judgment is inappropriate in this case. For instance, in *Sallie v. Thiel*, 23 F. App'x 586, 587 (7th Cir. 2001), the inmate stuck his arm through his cell trap

door and refused to retract it back into his cell. Correctional officers sprayed him with pepper spray and then one of them pushed on the trap door, severing the tip of the inmate's finger in the process. *Id.* The Court of Appeals overturned a grant of summary judgment to the officers, finding that a reasonable jury could conclude that the officer who pushed the door shut did so maliciously. *Id.* at 589. The court observed that, while "valid security reasons exist for keeping the feed slot doors in the segregation unit of a prison closed whenever possible," there appeared to be no urgent need to close the door at the time of the incident. *Id.* More importantly, the Seventh Circuit found that,

> [the officer's] awareness and intent when he shut the feed slot door is a material question of fact. If [the officer] closed the feed slot door knowing that [the inmate's] finger was caught in the hinges and intending to injure him, then [the officer] "maliciously and sadistically" caused [the inmate] harm. Because of the difficulty of proving a subjective state of mind, cases involving motivation and intent are often inappropriate for summary judgment. *See Alexander v. Wis. Dep't of Health and Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001). The record offers conflicting evidence concerning [the officer's] awareness and intent. The district court credited [the officer's] account of events over [the inmate's] and concluded that [the officer] had severed [the inmate's] finger accidentally. At the summary judgment stage, however, the record should have been reviewed in the light most favorable to [the inmate], and all inferences should have been drawn in his favor. *Frost*, 241 F.3d at 867–68. [The inmate] claimed that he cried out before [the officer] completely shut the door and severed his finger. In addition, in his response to interrogatories, [the officer] stated that he heard [the inmate] cry out while he was closing the door. [The inmate] also filed two affidavits from fellow prisoners who stated that [he] had cried out while [the officer] was closing the door. One could therefore infer that [the officer] knew that [the inmate's] finger was caught in the

door and that he intentionally and maliciously harmed [the inmate]. Summary judgment was therefore inappropriate.

*Id.*

The analysis here is indistinguishable from that in *Sallie*. First, although De La Vega claims that he needed to apply force to prevent further assault from Ards, (Docket #34 at 12–14), Ards avers that he never grabbed De La Vega or exclaimed profanities at him. In the present posture, the Court must credit Ards' account of events, and that account undermines De La Vega's claimed need for the use of force. Moreover, Ards' version of the encounter calls into question the amount of force De La Vega applied and his efforts to temper the force he used. *See Hill v. Shelander*, 992 F.2d 714, 717 (7th Cir. 1993) ("If the fact-finder were to accept [plaintiff's] story, then [defendant] arguably acted without justification because there would have been no need for [defendant] to physically assault [plaintiff] in order to maintain or restore discipline in the cell."). In fact, similar to the partial amputation in *Sallie*, here De La Vega lacerated Ards' hand and broke his index finger, injuries which required emergency-room surgery and lengthy follow-up treatment.

Recognizing the severity of Ards' injury and the questions surrounding the events leading up to it, Defendants attack the contention that De La Vega acted "maliciously and sadistically" when he kicked Ards' trap door shut on his finger. *Id.* at 15–16. Ards says De La Vega did act maliciously, claiming that De La Vega knew that Ards' hand was in the path of the closing trap door. Ards reasons that since he never retracted his hand from the opening and De La Vega never bladed himself as to the door, De La Vega had an unimpeded view of the location of Ards' hand. De La Vega disagrees, arguing that he acted in response to Ards' unprovoked attack and

that he did not see Ards' hand in the trap door until it was too late. For purposes of this motion, the Court cannot decide whose story is to be believed; as the Seventh Circuit instructed in *Sallie*, questions of the officer's intent and awareness in cases like this one are reserved for the jury at trial. Construing these conflicting accounts in Ards' favor permits the inference that De La Vega purposefully and maliciously kicked the trap door shut with Ards' hand in the way.

The Seventh Circuit's decision in *Outlaw* does not suggest a different result. There, the undisputed evidence showed that the officer slammed the inmate's hand in his cell trap door after the inmate extended his hand through the door while holding trash and exclaiming, "take this garbage, you bitch." *Outlaw*, 259 F.3d at 834–36. The inmate suffered only minor injuries. *Id.* The Seventh Circuit affirmed summary judgment in the officer's favor, finding that, because the inmate did not dispute that he had been insubordinate and threatening to the officer, there existed sufficient justification for the use of force. *Id.* at 838–39. Moreover, the court compared the need for force to the inmate's relatively minor injuries and concluded that the force applied was not excessive. *Id.* at 839. Thus, said the Court of Appeals, the most that could be said is that the officer "deliberately and perhaps unnecessarily applied a relatively minor amount of force to achieve a legitimate security objective." *Id.*; *see also White v. Matti*, 58 F. App'x 636, 638 (7th Cir. 2002) (rejecting excessive force claim where it was undisputed that the inmate reached through his trap door in violation of prison rules and suffered only minor injuries).

Two important facts distinguish this case from *Outlaw*. First, Defendants do not contest that, unlike the minor injuries in *Outlaw*, here Ards suffered severe injuries to his hand and finger. Second, Ards has

adequately contested the facts underlying De La Vega's version of their encounter. Thus, in contrast to *Outlaw*, where the plaintiff had admitted that he was insubordinate and threatening, here Ards' sworn statements indicate that he did nothing to provoke De La Vega. There is no other evidence, such as a video recording or statements of witnesses, regarding the events of December 7, 2014, beyond the averments of the two participants. Because their testimony differs in critical respects, the question of what really happened that evening must be posed to the jury and not prejudged by the Court. Further, despite the findings of two other prison officials that De La Vega did not use excessive force against Ards, the Court cannot grant summary judgment by counting which side has produced more affidavits in support of its position. *Waldridge*, 24 F.3d at 921. Absent evidence that Ards' version of events is fabricated or unreliable, the Court cannot discredit it at this stage.[13] Defendants' motion for summary judgment on this claim will, therefore, be denied.

### 4.3    Qualified Immunity

In addition to attacking Ards' claims directly, Defendants raise the defense of qualified immunity. That doctrine protects government officials from civil liability when they perform discretionary functions "insofar as

---

[13]The district court decisions Defendants cite which follow *Outlaw* are distinguishable on similar grounds—namely, that the inmate suffered only minor injuries and there was undisputed evidence justifying the correctional officer's use of force. *See, e.g.*, *Butler v. Meyers*, No. 10–CV–653, 2012 WL 996604, at *5–7 (E.D. Wis. Mar. 23, 2012) (inmate pepper sprayed after he refused numerous orders, was verbally threatening, and guards had attempted negotiations); *Jordan v. Anderson*, No. 09–1242, 2011 WL 2516928, at *3 (C.D. Ill. June 24, 2011) (officer caused minor injuries to inmate's arm while pushing back into cell through trap door after inmate refused to retract it); *Whitmore v. Alpert*, No. 08–cv–420–JPG–PMF, 2011 WL 1481956, at *1 (S.D. Ill. Apr. 19, 2011) (same); *Flanigan v. Wallace*, No. 09-cv-1179, 2010 WL 5071574, at *4 (C.D. Ill. Dec. 8, 2010) (same).

Case 2:15-cv-01293-JPS    Filed 11/16/16    Page 23 of 27    Document 64

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To defeat an assertion of qualified immunity, the plaintiff must first proffer facts which, if believed, amount to an actual violation of his constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Easterling v. Pollard*, 528 F. App'x 623, 656 (7th Cir. 2013). Next, the plaintiff must show that the violation of his constitutional rights was "clearly established under applicable law at the time and under the circumstances that the defendant official acted." *Easterling*, 528 F. App'x at 656 (citing *Pearson*, 555 U.S. at 232). A right is clearly established when its contours are "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and alterations omitted). Courts should "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Supreme Court recently emphasized that courts must not "'define clearly established law at a high level of generality.'" *Id.* (quoting *al–Kidd*, 563 U.S. at 742. It would not do, for example, to deprive a correctional officer of immunity merely because the Eighth Amendment broadly proscribes "cruel

and unusual punishment," or even more specifically, prohibits excessive force in the context of inmate discipline. *See id.* at 309 (faulting overbroad descriptions of Fourth Amendment rights such as "warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment"). The inquiry should be focused on particular conduct undertaken in particular situations. *Id.*

The Court finds De La Vega's assertion of qualified immunity unavailing.[14] Defendants argue that no case exists "that would give notice that the Eighth Amendment prohibits Department of Corrections officials from closing a trap door to restore order and security based on a threat that the official perceives." (Docket #34 at 26). This assertion is flawed on two levels. Initially, it wrongly assumes that the Court will accept De La Vega's version of events—that is, that Ards assaulted him and he therefore had legitimate security concerns for using force to close the trap door. The Court must construe the evidence in Ards' favor at this stage. *Mordi v. Ziegler*, 770 F.3d 1161, 1164 (7th Cir. 2014) ("The court cannot resolve disputed issues of fact when it addresses [whether a constitutional violation occurred] because the ordinary rules governing summary judgment apply in that situation."). As explained in the preceding section, the record, viewed in the light most favorable to Ards, could lead a reasonable jury to conclude that De La Vega used unconstitutionally excessive force during the December 7, 2014 encounter. *See Buchanan v. City of Milwaukee*, 290 F. Supp. 2d 954, 962 (E.D. Wis. 2003). Thus, Ards has developed evidence which, if believed, would amount to a violation of his constitutional rights.

---

[14]Because the Court grants summary judgment to Defendants Blasius and Brady on other grounds, it does not decide whether they would, in the alternative, enjoy qualified immunity from Ards' claims.

Second, the Court finds that Ards' constitutional right was clearly established at the time of De La Vega's conduct. In keeping with the most recent authority from the Supreme Court, this Court will define the relevant constitutional right narrowly, tailoring it to the context of this case. *See Mullenix*, 136 S. Ct. at 308. Employing that approach, the question is whether any reasonable official would have known that kicking a cell trap door shut with an inmate's hand in the way, without provocation and causing severe injury, violated the inmate's constitutional rights.

The Court answers that question in the affirmative. In the preceding section, the Court discussed a line of cases in this Circuit addressing claims of excessive force arising from incidents involving cell trap doors. One such case, *Sallie*, is particularly apposite here. *Sallie* explains that where an officer knowingly closes a cell trap door on an inmate's hand without a valid reason, causing severe injury, he will be liable for using unconstitutionally excessive force. *Sallie*, 23 F. App'x at 589. Even *Outlaw*, in which the Seventh Circuit ruled in the officer's favor, demonstrates what sort of factors need to be present to avoid liability—*e.g.*, a good reason to use force, such as threats or insubordination, and an amount of force tailored to those needs. *Outlaw*, 259 F.3d at 838–39. Given this controlling precedent, it was "beyond debate" at the time De La Vega acted that his conduct violated Ards' Eighth Amendment right to be free from cruel and unusual punishment. *Werner v. Wall*, No. 14-1746, 2016 WL 4555610, at *7 (7th Cir. Sept. 1, 2016).

Resolving the disputed facts in Ards' favor, as the Court must do here, De La Vega is not entitled to summary judgment on his qualified immunity defense. *See Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 916 & n.13 (7th Cir. 2011). After the jury determines the facts underlying this defense, he may revisit it.

5. CONCLUSION

Ards has demonstrated that genuine disputes of material fact exist with respect to his excessive force claim against De La Vega. He has not done as much for his deliberate indifference claim. Additionally, De La Vega is not entitled to qualified immunity at this time. Defendants' motion for summary judgment must, therefore, be denied as to the excessive force claim and granted as to the deliberate indifference claim.

Accordingly,

IT IS ORDERED that Defendants' motion for summary judgment (Docket #33) be and the same is hereby GRANTED in part and DENIED in part;

IT IS FURTHER ORDERED that Plaintiff's deliberate indifference claim against Defendants Travis Brady and Lora Blasius be and the same is hereby DISMISSED with prejudice; and

IT IS FURTHER ORDERED that Plaintiff's motion for extension of time to file his response to Defendants' motion for summary judgment be and the same is hereby DENIED as moot.

Dated at Milwaukee, Wisconsin, this 16th day of November, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

Case 2:15-cv-01293-JPS   Filed 11/16/16   Page 27 of 27   Document 64